**Fred A. BALE**

v.

**Charles RYDER and City of Portland.**

Supreme Judicial Court of Maine.

Jan. 21, 1972.

Henry N. Berry, III, Portland, for plaintiff.

William B. Troubh, Portland, for Ryder.

Robert W. Donovan, Charles A. Lane, Portland, for City of Portland.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

POMEROY, Justice.

A civil complaint was entered in the Superior Court alleging Ryder and the City of Portland were liable to the plaintiff as the result of an alleged false arrest of the plaintiff, Fred A. Bale, and an alleged assault and battery upon the plaintiff by Ryder.

Ryder, at the time the incident is alleged to have occurred, was an on-duty policeman employed by the City of Portland.

The filing of the complaint was followed by a motion to dismiss as to the City of Portland on the ground it enjoyed immunity from liability in the circumstances here presented.

The motion was granted.

The suit against Ryder was tried before a jury and a verdict returned in favor of the plaintiff. Seasonably, plaintiff appealed from the order dismissing the complaint as to the City of Portland. That action is now before us for review.

Once again we are faced with a challenge to the time-honored rule of sovereign immunity.

The plaintiff's position is simply that we should discard the rule of sovereign immunity and reinstate his action against the City of Portland. He frankly recognizes the case law of Maine has always been, a municipality is immune from legal liability when acting in a governmental capacity except as otherwise provided by statute. This rule has long since outlived its usefulness, he says, and this Court should once and for all inter it.

As a result of the rule of sovereign immunity in those instances in which it is applicable, one injured by an act of the state or an agency thereof under circumstances which would have imposed legal liability but for such immunity, is left to bear the entire burden of the misfortune which befell him through no fault of his own.

This is wrong, say many courts and an overwhelming majority of text-writers. The doctrine has been characterized as, "one of the most discredited and yet sanctified doctrines in the great moving stream of our common law." American Trial Lawyers Journal Vol. 32, p. 286.

Former Chief Justice Traynor of the Supreme Court of California, writing in Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961), for the majority, described it as "mistaken and unjust."

This Court in Nelson v. Maine Turnpike Authority, 157 Me. 174, 170 A.2d 687 (1961), acknowledged that the doctrine has been "subject to sharp criticism and attack in the past few years."

And well it should!

In *Nelson* when this Court was faced with a similar demand that the sovereign immunity rule be abolished, it said:

"The issue is not complex. Should sovereign immunity in tort, time tested in our State, be discarded or destroyed? This is a policy question which, in our opinion, is more properly directed to the Legislature than to the Court. Federal Tort Claims Act of 1946, 28 U.S.C.A. §§ 2671–2680 is an outstanding example of waiver of immunity by legislative action." 170 A.2d 687, 693 (1961).

We note the Court did not decide that the sovereign immunity issue was *only* a policy question.

We see in the issue not only the broad policy question but also the basic question as to whether the interpretation placed on the rule down through the years is correct and can withstand the test of logic.

We conclude application of the so-called doctrine has been incorrect and its application cannot withstand the test of logic.

The doctrine had its origin in the courts rather than in legislative bodies.

Some legal historians trace it back to the Roman Law.

In *Muskopf*, supra, Mr. Justice Traynor attributed its origin to the personal prerogatives of the King of England.

If, as most historians agree, the doctrine had its origin in the personal prerogative of the King of England, it is apparent the concept was misunderstood and misapplied both in England and in this country. What was originally intended by the maxim that the "King can do no wrong" was that it was unthinkable to conceive that the King

*would* do wrong and the King was not privileged to do wrong.

According to Pollock and Maitland, the History of English Law, p. 512, "in the feudal structure the lord of the manor was not subject to suit in his own courts." It followed that the King, the highest feudal lord, enjoyed the same protection: no court was above him. There was no jurisdiction in the King's Court to grant relief against the King. However, there was a petition of right in the Court of Exchequer. The petition of right stated a claim against the King which was barred only by his prerogative. To a petition, "there must always be a reply: let right be done." Holdsworth, the History of Remedies against the Crown. 38 L.Quar.Rev. 141.

It follows since the rule was related only to the jurisdiction of the King's Court and in view of the fact even as against the King there was jurisdiction in the Court of Exchequer, the original concept of "Sovereign Immunity" could never justify extension of the so-called doctrine as it came to be understood, to local government.

Nevertheless, the principle was extended to local government in Russell v. Men of Devon, 100 Eng.Rep. 359 (1788).

The first American case firmly establishing local governmental immunity was Mower v. Inhabitants of Leicester, 9 Mass. 247 (1812). Interestingly enough that Court said: "But it is well settled that the common law gives no such action." Russell v. Men of Devon is cited as authority, despite the fact that *Russell* was decided after the Declaration of Independence.

The doctrine of governmental immunity spread rapidly thereafter. Ultimately the United States Supreme Court in Osborn v. Bank of United States, 22 U.S. 738 (9 Wheat. 738), 6 L.Ed. 204 (1824), declared that neither the United States nor any one of the several states may be sued by a private citizen without its consent.

As a result of *Osborn*, the rule here, as in England, was that the government could not be sued without its consent. The consent required some special legislative action. Ultimately the system of special bills became so burdensome and faulty the United States Court of Claims was established. Some legislative bodies, including the Maine Legislature, attempt to adjudicate claims themselves.

Another technique often used was to create a special court with power to adjudicate the claims. Some municipal governments have claim committees and members of the municipal governing body undertake the adjudication process themselves.

The venerable Roscoe Pound, writing in Pound, Justice According to Law, p. 69 (1951), wrote:

"Legislative investigations are notoriously and often crudely partisan."

While there is nothing in our history to indicate that legislative justice in Maine ever has been partisan, experience elsewhere inevitably leads to the conclusion the potential abuse is inherent in the system.[1]

One of the earlier attempts to avoid the harshness of the strict sovereign immunity rule resulted in the spelling out of the distinction between governmental and proprietary functions of a municipal corporation.

The first clear statement as to the distinction is found in Bailey v. Mayor, etc., of City of New York, 3 Hill, N.Y., 531, 38 Am.Dec. 669 (1842). That Maine had embraced this distinction was made clear in Bouchard v. City of Auburn, 133 Me. 439, 179 A. 718, (1935).[2]

---

1. See: Leflar and Kantrowitz, Tort Liability of the States, 1954, 29 N.Y.U. Law Rev. 1363, for exhaustive summary of statutes and common law of each State.

2. For collection of Maine cases as of the time the article was written, indicating situations in which a municipal corporation has immunity and situations in which it does not, see Weber, Municipal Tort Liability, Vol. 3, Peabody Law (1938).

The Legislature's handling of the sovereign immunity question has been, to say the least, confusing. Very early in the State's history liability under certain conditions was imposed on the cities and towns from defects in the highways of which notice was given. Maine Laws, 1821, Chap. CXVIII, Sec. 17. Yet as recently as 1941 our Legislature said:

"Airports owned and operated by any city, town or county are declared to be governmental agencies entitled to the same immunities as an agency of the State." 6 M.R.S.A. 163

In Nelson v. Maine Turnpike Authority, supra, this Court pointed out that under the provisions of the Private & Special Laws, 1941, c. 69, immunity from tort liability was extended to the Maine Turnpike Authority.

The Legislature obviously recognizing the many injustices resulting from governmental immunity from liability when negligent operation of motor vehicles by State and local employees is involved and recognizing that the State and its various agencies maintain a very large fleet of motor vehicles on the highways, enacted what is now 14 M.R.S.A. 157.

While this has provided partial relief from a situation quite generally regarded as unjust, no remedy is provided for the vast number of situations in which unqualified immunity applies.

In 1961 in Nelson v. Maine Turnpike Authority, supra, this Court observed:

"We may agree that the State, or its agency, the Authority, ought to bear the plaintiff's loss under the circumstances set forth. We may agree that sovereign immunity from tort liability has served its usefulness and ought to be destroyed. These are reasons directed, in our opinion, to the determination of the policy of the State, and not to the construction of legislative acts in the process of ascertaining the intent of the Legislature."
170 A.2d 687, 693 (1961)

The Court earlier in the opinion pointed out that "only the clearest and most convincing reasons should compel a reversal by our Court."

There followed only the enactment of 14 M.R.S.A. 157, a half measure at best.

More recently in Blier v. Inhabitants of Town of Fort Kent, Me., 273 A.2d 732 (1971), we again pointedly said:

"These judicial discriminations in the law of governmental responsibility for tort, resulting in incongruities from attempts to fit particular conduct into either the governmental or proprietary class of activity, have brought the doctrine of governmental immunity into disrepute. Legal writers and scholars in articles and texts almost unanimously severely criticized the continued judicial support given to the doctrine. Some courts have repudiated it and changed their common law without legislative direction."

Me., 273 A.2d 732, 736 (1971)

Chief Justice Kenison, dissenting in Gossler v. City of Manchester, 107 N.H. 310, 221 A.2d 242 (1966), said:

"Every member of this court knows 'that municipal immunity is on the wane elsewhere, has been subjected to a barrage of criticism and has been abolished * * *' in many jurisdictions by judicial decisions having prospective effect only. (Citations omitted) Furthermore our classification of particular municipal functions as governmental with immunity on the one hand, and proprietary with liability on the other hand, is confused inconsistent and difficult, so that our rules for solving these problems 'are as logical as those governing French irregular verbs.'"

■ Despite what we have said above, we recognize that though the Court may have some responsibility for abrogating court-made rules where the court considers them unworkable or unjust, the particular

question now posed before us embraces extremely broad considerations of public policy and government administration. This Court has two alternatives and only two. It can leave the policy question to be resolved by the Legislature or it can abrogate the doctrine, either applying it to this case or giving it prospective application only.

As a Court we lack the ability to create a system such as the Federal Tort Claims Act or to place limits upon the extent of liability in any case in which experience might indicate such limits ought be imposed.

We do not hold the purse strings. We have no power to levy taxes or otherwise provide funds to meet liability which would result from a decision abrogating the immunity doctrine. The Legislature has the power, the capacity and the administrative machinery for conducting investigations and for giving consideration to several plans which could be advanced to solve the problem with relatively minor impact upon the municipal treasury.

For these reasons we feel it would not be appropriate for us at this time to abrogate the existing rule of sovereign immunity by judicial fiat. We do not consider this case to be "the clearest and most convincing reason[s]" compelling a reversal by our Court of the policy so long established and so long acted upon.

For the reasons above stated, we decline to set aside the order of the Court below.

The entry must be,

Appeal denied.

All Justices concurring.