James Donald YDE, a/k/a James D. Edwards, a/k/a James Donald Edwards

v.

STATE of Maine and Clerk of Superior Court, Cumberland County.

Supreme Judicial Court of Maine.

Aug. 4, 1977.

Paula H. Elkins, Cape Elizabeth, for plaintiff.

Leon V. Walker, Jr., Asst. Atty. Gen., Augusta, Peter Ballou, Deputy Dist. Atty., Portland, for defendants.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

This action for post-conviction relief is before us on report. We hold that James Donald Yde's petition for a writ of habeas corpus must be dismissed.

On January 10, 1975,[1] Yde filed a document in the Superior Court (Cumberland County) entitled "Writ of Mandamus" seeking the "expungement" from his "criminal arrest record" of two convictions obtained pursuant to guilty pleas entered by him in that court in September, 1952.[2] The writ named Cumberland County and the City of Portland as "respondents." The action was treated as a petition for a writ of habeas corpus, 14 M.R.S.A. §§ 5502–5508, and the case was assigned to a single Justice of this Court sitting in the Superior Court for hearing. Yde demonstrated his indigency and Maine counsel was appointed to represent him. The writ was subse-

---

1. At that time, Yde was serving a prison term in the United States Penitentiary at Atlanta, Georgia, resulting from his conviction in 1973 in the United States District Court for the Western District of Tennessee of a violation of the National Motor Vehicle Theft Act.

2. The Cumberland County Superior Court criminal docket for September, 1952 which is part of the record on report indicates that Yde, who was then known as James D. Edwards, pleaded guilty in docket number 1027, "uttering forged check (Beaulieu)," and docket number 1028, "uttering forged check (First National)." In docket number 1027, Yde was placed on probation for a period of two years. Docket number 1028 was "[c]ontinued generally for sentence," with the notation "[n]ot to be brought forward except by special order of Court."

quently amended with leave of the court and styled "Amended Petition for Writ of Habeas Corpus," with the State of Maine, the Clerk of the Cumberland County Superior Court, and the Chief of Police of the City of Portland, designated as respondents.

The petition asserts that Yde's incarceration in the federal penitentiary in Georgia is "in part" attributable to his two convictions in Maine in 1952.[3] It is alleged that those two convictions are "illegal and imposed in violation of the Constitution of the United States and the Constitution of Maine in that Petitioner was denied his right to counsel," and that "there is no record that Petitioner's guilty pleas were knowingly and intelligently made." The petitioner requests, *inter alia*, that his Maine convictions "be declared null and void and unconstitutional."

The State moved to dismiss the petition, arguing (1) that "[i]t fails to allege valid facts upon which relief can be granted," (2) that "[t]he Court lacks jurisdiction over the subject matter of this action," and (3) that "[t]he Court lacks jurisdiction over the petitioner."

With the case in this posture, the Justice, with the assent of the parties, ordered the action reported to the Law Court in accordance with M.R.Civ.P. 72.[4] The record on report includes the pleadings and motions which were filed below, and an agreed statement of facts prepared by the parties.

We conclude that the Maine courts are without jurisdiction to entertain this petition, on the ground that Yde, who concedes that he has been fully discharged from any sentences imposed on him by the State of Maine, does not qualify under 14 M.R.S.A. § 5502 as

[a] person convicted of a crime and incarcerated thereunder including any person

committed as a juvenile offender, or released on probation, or paroled from a sentence thereof, or fined . . . . .

In *Green v. State*, Me., 237 A.2d 409 (1968), we had occasion to consider a petition for post-conviction relief brought by a petitioner who, upon his conviction of larceny in Knox County in 1949, was sentenced, in accordance with a then-existent Maine "recidivist" statute, R.S. 1944 ch. 136, § 3, to a term of twelve to twenty-four years in the Maine State Prison. Had it not been for the fact that Green had previously been convicted of robbery in Maine in 1943,[5] the maximum sentence that he could have received for the 1949 larceny conviction would have been five years. We held that Green met the jurisdictional requirement of § 5502, and that the Superior Court could properly consider his challenge to the constitutionality of the 1943 conviction, adopting the petitioner's argument that "the sentence he is now serving [is] directly attributable to the enhancement of the larceny sentence by application of the recidivist statute." *Id.* at 411.

*Green* was followed by *Thoresen v. State*, Me., 239 A.2d 654 (1968), in which we were presented with a petition for a writ of habeas corpus from a petitioner who had been convicted of larceny in Maine in 1959 and placed on probation for a period of two years. The probation was judicially terminated in 1961. In 1967 Thoresen was indicted in a United States District Court in California for an alleged violation of a federal statute. An element of the federal crime with which he was charged was that he was a person previously convicted in another state (Maine) of a crime punishable by a prison term of more than one year. Thoresen commenced his post-conviction attack on his 1959 Maine conviction while he was under the federal indictment.

3. The record includes a transcript of the sentencing proceedings in the case of *United States v. Yde*, docket number CR–73–162, in the United States District Court for the Western District of Tennessee, Western Division, in which the court makes one brief reference to Yde's extensive criminal record without, however, specifically mentioning the Maine convictions.

4. By order of the presiding Justice, the Chief of Police of the City of Portland has been dismissed as a respondent. M.R.Civ.P. 21.

5. Green had fully executed the sentence imposed on him as a result of his robbery conviction in 1943.

We construed § 5502 as requiring the dismissal of Thoresen's petition, concluding that he was "a petitioner who admittedly is under no form of restraint in Maine." *Id.* at 655. In so ruling, we distinguished *Green* in the following terms:

> [I]n *Green* there was the presently existing restraint in Maine which the post-conviction habeas corpus statute in clear and unambiguous terms requires as a prerequisite to relief. The absence of any form of continuing restraint in the instant case is fatal to the petitioner's claim.

*Id.* at 656.

■ In *Staples v. State*, Me., 274 A.2d 715 (1971), we expressly declined to overrule *Thoresen* and reiterated our view that Maine post-conviction relief is available only "when the petitioner is under some form of restraint, actual or technical, under Maine law." *Id.* at 716. We accordingly held that a petition for a writ of habeas corpus brought by a petitioner confined in the Nevada State Prison as a result of his felony conviction in that State was correctly dismissed, notwithstanding that, under Nevada law, the petitioner would have been eligible for parole had it not been for the fact that he had two prior felony convictions in Maine [6] which, in conjunction with the Nevada conviction and one other, caused him to be placed in a less favorable parole status.

Yde posits that his case is controlled by *Green*, rather than *Thoresen* and *Staples*. We are unimpressed with this argument. In *Green*, the petitioner was plainly "under some form of restraint . . . under Maine law," *Staples, supra* at 716, insofar as the sentence he was serving was one imposed by a Maine court pursuant to a Maine recidivist statute. In *Thoresen* and *Staples*, by contrast, neither petitioner was under any sort of restraint imposed by Maine law:

Thoresen was under federal indictment in California, and Staples was incarcerated in Nevada as a consequence of his felony conviction in that state.

■ Yde, like Thoresen and Staples, has executed any sentences which were imposed on him by the State of Maine. He is under no form of restraint under Maine law. The bare fact that a federal judge in Tennessee allegedly took Yde's prior criminal record, including two Maine convictions, into account in sentencing Yde to federal prison, does not entitle Yde to post-conviction relief in Maine.[7] The petitioner has not met the jurisdictional prerequisite of § 5502, and we conclude that his petition must be dismissed.

The entry must be

Appeal dismissed.

DUFRESNE, C. J., and ARCHIBALD, J., concurring in separate opinions.

POMEROY and WERNICK, JJ., dissenting in separate opinions.

ARCHIBALD, Justice, concurring.

I concur with the opinion of Mr. Justice Delahanty, but in view of the dissents I feel it appropriate to specify my reason for so doing.

My reading of the dissents leads me to conclude that neither has any disagreement with the result reached by Mr. Justice Delahanty if *Thoresen v. State*, 239 A.2d 654 (Me. 1968), has continuing vitality. Otherwise stated, both the dissenters would appear to agree that the result reached by the majority opinion is mandated unless *Thoresen* is expressly overruled.

If the above understanding is correct, I fail to see the significance in the dissents involving *Staples v. State*, 274 A.2d 715

---

**6.** Like Green, Staples had been discharged from the sentences imposed on him as a result of his Maine convictions.

**7.** Our observation in *Staples*, 274 A.2d at 716, bears repeating:

> The Legislature in providing a comprehensive procedure for collateral attacks on convictions has seen fit to limit the court's jurisdiction to persons who are still under restraint by this state. This is a matter of legislative policy and no doubt results from the legislature's judgment that a contrary rule might well overwhelm the courts with stale and frivolous claims the very antiquity of which would defy proper determination.

(Me. 1971). *Staples* added nothing to the interpretation of 14 M.R.S.A. § 5502 beyond that already given in *Thoresen*. I gather that the dissenters would have reached the same result if *Staples* had never been written.

In my opinion, the minority has overlooked a basic rule of statutory construction or, at least, has failed to acknowledge its existence, in their zeal to leave *Thoresen* vulnerable to a subsequent possibility of being overruled by a court composed of more than five Justices.

In *Davies v. City of Bath*, 364 A.2d 1269 (Me. 1976), we overruled the doctrine of governmental immunity but carefully noted that in so doing we were abandoning a rule that had come into being by virtue of a *judicial fiat and not through legislative action.* We held that if "past judicial doctrines" are no longer efficacious, we should not be bound by the "constraints of *stare decisis.*"

In the present case, however, we are not concerned with "past judicial doctrines" but are dealing with past statutory construction. I believe this distinction is critical.

In *State v. Pratt*, 151 Me. 236, 237–38, 116 A.2d 924, 925 (1955), where the State urged that the Court adopt a broader statutory interpretation than that previously given, it was held:

> "The Legislature has not seen fit to amend the act since these decisions were rendered and may be deemed to have accorded tacit approval to that breadth of definition."

Where courts have been requested to overrule a previously announced construction of a statute, the general rule would seem to reject such efforts. Courts generally held that the settled law be followed on the premise that a statutory construction by the court of last resort of a given state warrants an assumption that the state legislature acquiesced in that construction. As the Illinois Court recently put it, quoting *People v. Hairston*, 46 Ill.2d 348, 263 N.E.2d 840, 845 (1970),

> "where a statute has been judicially construed and the construction has not

evoked an amendment, it will be presumed that the legislature has acquiesced in the court's exposition of legislative intent."

*Kobylanski v. Chicago Board of Education*, 63 Ill.2d 165, 347 N.E.2d 705, 709 (1976). For cases adopting this same rationale, see *Eastern Scrap Services, Inc. v. Harty*, 341 A.2d 718, 719 (R.I. 1975); *General Electric Co. v. E. Fred Sulzer and Co.*, 86 N.J.Super. 520, 207 A.2d 346 (1965); *Republic Steel Corp. v. Industrial Commission*, 26 Ill.2d 32, 185 N.E.2d 877, 885 (1962); *Scribner v. Sachs*, 18 Ill.2d 400, 164 N.E.2d 481, 490 (1960); *Kusior v. Silver*, 54 Cal.2d 603, 7 Cal.Rptr. 129, 354 P.2d 657, 667 (1960); *State v. Pratt, supra; Barringer v. Miele*, 6 N.J. 139, 144, 77 A.2d 895, 897 (1951).

14 M.R.S.A. §§ 5502–08 was enacted by P.L. 1963, ch. 310. Although § 5502 has not been amended, § 5505 has been subject to two amendments as has § 5508, all four amendments having been adopted subsequent to *Thoresen*, which was decided in 1968. All of the cases are consistent that under this factual background we can assume that the Legislature acquiesced in the construction given § 5502 in *Thoresen* since, otherwise, an amendment would have resulted.

Deference to the Legislature has always guided this Court when established concepts became suspect, even when dealing with non-legislatively created doctrines. For example, in *Nelson v. Turnpike Authority*, 157 Me. 174, 185, 170 A.2d 687, 693 (1961), while acknowledging that a rule of law "judge-made . . . could be judge-changed," the Court, in deference to the Legislature, refused to overrule the judicially created doctrine of sovereign immunity. Speaking for a *unanimous* Court, Mr. Justice Pomeroy reached an identical result in *Bale v. Ryder*, 286 A.2d 344 (Me. 1972), *even though eleven years had intervened* since *Nelson* was decided. Again, in a *unanimous* decision, we did likewise in *Bartashevich v. City of Portland*, 308 A.2d 551 (Me. 1973).

I think that the desire of the minority to overrule *Thoresen* is encroaching upon leg-

islative prerogative and would engraft on § 5502 an impermissible legislative intent. I believe we are compelled by precedent to defer to the Legislature in this matter.

DUFRESNE, Chief Justice, concurring.

I join in the opinion of Mr. Justice Delahanty and in the concurring opinion of Mr. Justice Archibald, and, in view of the dissents, I wish to add that, although I did not participate because of illness in the opinion of *Thoresen v. State*, 1968, Me., 239 A.2d 654, I was committed to the principles adopted in the decision. Being the Justice who presided at the Superior Court level in *Staples v. State*, 1971, 274 A.2d 715, I wish to state for the record what I did say in my decision in that case:

"The Maine convictions are of no concern to the State of Maine at the present time. Petitioner has paid his debt to the State. As stated in *Thoresen, supra*, the legislative requirement that there be a presently existing actual, technical or potential physical restraint in Maine stems from legislative judgment that litigation must eventually come to an end. Whether post conviction habeas corpus relief should be made available in the courts of this State to permit collateral attacks of convictions where sentences have been fully executed for the sole purpose of liberating one convicted of crime from the serious disabilities that admittedly continue flowing from the conviction, is a matter of legislative policy and not of judicial concern. We do recognize that the inadequacy of our post conviction procedure as construed by the Supreme Court of this State to afford relief against extraterritorial restraints of Maine convictions based upon federal constitutional infringements may inevita-

bly result in remitting prisoners under such legal hindrances to the Federal courts where relief may possibly be obtained. We do believe, however, that the primary responsibility to provide relief in the instant case lies upon the State of Nevada which controls the petitioner's eligibility for parole. It is by virtue of Nevada law that the Maine convictions bar eligibility for parole. Maine law has no extraterritorial power to affect penal policies of a sister State."

Furthermore, I may add that Mr. Justice Weatherbee, who also did not participate in *Thoresen*, was not adverse to the ruling therein, since he joined without dissenting comment in these excerpts from the following opinions:

*Green v. State*, 1968, Me., 245 A.2d 147 at 150:

"In *Thoresen, supra*, we did re-affirm the liberal construction of the statute espoused in the recent case of *Green v. State of Maine et al.*, 1968, Me., 237 A.2d 409, but denied relief in the absence of a presently existing restraint in Maine."

*Stewart v. State*, 1969, Me., 259 A.2d 664 at 665:

"Similarly, *Thoresen* does not apply, since in that case there was no presently existing restraint in Maine which our post-conviction habeas corpus statute requires as a prerequisite to relief."

POMEROY, Justice, dissenting.

I respectfully dissent from the decision reached in this case. I agree that so long as *Thoresen v. State*, Me., 239 A.2d 654 (1968) retains vitality, it controls the decision in this case.

I would overrule *Thoresen* and the case which expressly reaffirmed it.[1]

---

1. *Staples v. State*, Me., 274 A.2d 715 (1971). I am aware that I joined the opinion of the court in *Staples*. I am now satisfied I should not have done so. When they found themselves in a similar situation, Justices Emery and Whitehouse wrote:

"The undersigned Justices, EMERY and WHITEHOUSE, concurred in the refusal to answer in the later case [Removal and Ap-

pointment of County Attorneys], 85 Me. 545 [27 A. 454], but wider research, and more mature consideration, have now convinced them that they were then in error." *Opinion of the Justices*, 95 Me. 564, 579, 51 A. 224 (1901).

Former Justice Jackson wrote in *McGrath v. Kristensen*, 340 U.S. 162, 178, 71 S.Ct. 224, 95 L.Ed. 173 (1950) when he found himself in a position similar to mine:

Though there may not be a remedy for every wrong,

"Maine and its people always endeavor to do exact justice under and according to the Constitution and the common and statutory law." *Dwyer v. State*, 151 Me. 382, 394, 120 A.2d 276, 283 (1956).

The existing interpretation of 14 M.R.S.A. § 5502[2] (post-conviction habeas corpus) as decided by the *Thoresen* court neither adheres to this principle, nor does it, in my opinion, correctly interpret the statute.

The *Thoresen* court interpreted section 5502 as requiring *"existing actual or physical restraint or a technical hold or restraint which under appropriate circumstances . . . could be converted to a physical restraint."* *Thoresen v. State,* supra at 655. Seemingly, it is the language *"[a]ny person convicted of a crime and incarcerated thereunder . . ."* which the court construed as requiring this continued restraint.

A literal reading of the words of the statute does not compel the conclusion that the legislature intended to impose a requirement of continued restraint under the challenged conviction as a condition of the availability of 14 M.R.S.A. § 5502. Rather, it appears that the only threshold requirement that needs be met by a petitioner is to demonstrate a lack of mootness when the petition is brought.[3]

"My own error, however, can furnish no ground for its being adopted by this Court . . . . [A]n escape . . . was taken by Lord Westbury, who, it is said, rebuffed a barrister's reliance upon an earlier opinion of his Lordship: 'I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion.' If there are other ways of gracefully and good naturedly surrendering former views to a better considered position, I invoke them all."

Perhaps I can more succinctly describe my present circumstances by quoting from *Andrews v. Styrap*, 26 L.T. 704, 706 (1872): "The matter does not appear to me now as it appears to have appeared to me then."

2. 14 M.R.S.A. § 5502 reads in pertinent part:

"Any person convicted of a crime and incarcerated thereunder including any person committed as a juvenile offender, or released on probation, or paroled from a sentence thereof, or fined, . . . may institute a

The Supreme Court of the United States has consistently recognized that *"due process"* demands judicial machinery to correct a wrong in the administration of criminal justice due to a " 'failure to observe that fundamental fairness essential to the very concept of justice,' " *Hysler v. Florida*, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932, 935 (1942), quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, 180 (1941); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). To interpret section 5502 as the *Thoresen* court did is to eliminate the availability of the machinery to correct a failure of due process once a convicted defendant has served his sentence and is no longer under any restraint in Maine.

In ascertaining the legislature's intention, we cannot overlook the time sequence of the development of 14 M.R.S.A. § 5502 and its relation to the ferment in the federal courts which culminated in the landmark decisions of the Supreme Court of the United States in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1973), and *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). These cases made it abundantly clear that unless state courts had *adequate* post-conviction procedure for the protection of a person's rights, the federal courts

petition for a writ of habeas corpus . . .."

3. In describing those persons to whom the remedy of 14 M.R.S.A. § 5502 is available, the statute includes a person *"fined."* It does *not* require that the person fined shall not have paid the fine. *See Briggs v. State*, 152 Me. 180, 126 A.2d 563 (1956) (Williamson and Webber, JJ., concurring specially) and in which, although asserting that they would regard the payment of a fine as rendering *"moot"* an attack on the validity of the conviction, they further acknowledge

". . . when and if an outstanding criminal record is shown to handicap a person, he will not be precluded from testing its legality solely on the ground that the case is moot. At that point the case will not be closed. It will again have life in relation to another case or transaction. We are not here considering other reasons, such as limitations of time, which might prohibit the use of a writ of error." *Id.*, 152 Me. at 187, 126 A.2d at 566.

would, in effect, take over the responsibility.

In 1954 the report of the Special Committee on Habeas Corpus of the Conference of Chief Justices urged that

"State statutes should provide a postconviction process *at least as broad in scope as existing Federal statutes under which claims of violation of constitutional right asserted by State prisoners are determined in Federal courts under the Federal habeas corpus statutes.*" (emphasis added) H.R. Rep. No. 1293, 85th Cong., 2d Sess., pt. 7 *et seq.*

In 1958 the Burton Committee (the Committee on Post-Conviction Remedies of the American Bar Association Section on Judicial Administration) reported out a preliminary draft finding

"that the law of state post-conviction process in many states was wholly inadequate to cope with the demands now being placed upon it. In some jurisdictions prisoners were altogether precluded from direct access to the courts. [Citations omitted.] . . . In many more, the procedures recognized by state law failed to provide genuine opportunities for testing constitutional issues of the most numerous and important types. The result was that prisoners often failed to obtain hearings on their allegations in the state courts. This, in turn, increased the number of petitions in state and federal courts and was generally productive of frustrations in all persons concerned with the process." *See Case v. Nebraska,* 381 U.S. 336, 339, 85 S.Ct. 1486, 1488, 14 L.Ed.2d 422, 424–25 (1965).

It is inconceivable to me, in view of the activity in the federal courts and in view of the recommendations which had been made by court and bar association groups after intensive study of the problem, that the legislature intended in 1963 (when 14 M.R.S.A. § 5502 was enacted) to *limit* the availability of post-conviction review of convictions beyond those existing at the time of the rejuvenation of coram nobis in *Dwyer v. State,* supra.

In 1963 the habeas corpus post-conviction statute (14 M.R.S.A. § 5502 *et seq.*) was enacted exactly as it was proposed in L.D. 982 except Committee Amendment A (S–206 which changed the wording "of the 2nd paragraph of that part designated 'Sec. 1–A' of section *1*" of the proposed act to substitute the language:

"The remedy of habeas corpus provided in sections 1–A to 1–G is not a substitute for nor does it affect any remedies which are incidental to the proceedings in the trial court, or any remedy of direct review of the sentence or conviction but, except as otherwise provided in sections 1–A to 1–G, it comprehends and takes the place of all other common law remedies which have heretofore been available for challenging the validity of a conviction and sentence and shall be used exclusively in lieu thereof: (1963 Legislative Record 1843)

for the words:

"The remedy of habeas corpus provided in sections 1–A to 1–G is not a substitute for nor does it affect any remedies which are incidental to the proceedings in the trial court, or any other review of the sentence or conviction."

I see nothing in the language employed which could give comfort to those who might argue that the legislature intended, by such amendment, to narrow the availability of post-conviction relief. Rather, it is very plain that by specifying that the post-conviction habeas corpus statute "comprehends and takes the place of all other common law remedies which have heretofore been available for challenging the validity of a conviction and sentence," the legislature intended there be no narrowing of the availability of remedies existing prior to the enactment of the statute. The phrase "except as otherwise provided in sections 5502 to 5508" is easily explainable as emphasizing that the post-conviction relief was not to "affect any remedies which are incidental to the proceedings in the trial court, or any remedy of direct review of the sentence or conviction."

In the case now before us, petitioner claims he was denied counsel to represent

him in the proceedings which resulted in his conviction in Maine. If he were able to prove that allegation of his petition for habeas corpus, he would have established that he had been deprived of one of the most important personal rights guaranteed by the Constitution. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

The conviction, he says, had serious and continues to have serious consequences to him beyond the consequences that he was imprisoned in Maine.[4]

The result which the majority has reached in this case, as admittedly mandated by *Thoresen*, is that Maine denies petitioner the opportunity to come into Maine, as he has, and demonstrate, if he can, that he was deprived of the constitutionally guaranteed right to counsel because he was not at the time of bringing his petition for habeas corpus (post-conviction) under any "existing actual or physical restraint or a technical hold or restraint which under appropriate circumstances . . . could be converted to a physical restraint." *Thoresen*, supra at 655.

To revert again to the governing philosophy of the State of Maine as described in *Dwyer*, supra:

"Maine takes pride in attempting to carry out the old maxim that 'for every wrong there is a remedy.'" 151 Me. at 395, 120 A.2d at 283.

I am now satisfied that when the requirement of existing actual or physical restraint was imposed by *Thoresen*, the habeas corpus post-conviction statute (14 M.R.S.A. § 5502) was misconstrued.

The statute by its own terms "comprehends and takes the place of all other common law remedies which have heretofore been available . . . ." The common

law writ of habeas corpus and a statutory form of the common law writ of error coram nobis[5] existed at the time 14 M.R.S.A. § 5502 was adopted. While it is true that continued incarceration, or its equivalent, was a prerequisite to the issuance of a common law *writ of habeas corpus*, such a requirement did not exist and in fact would have frustrated the function of a *writ of error coram nobis*. *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954). Since 14 M.R.S.A. § 5502 acts as a substitute for not only a common law writ of habeas corpus but also a writ of error coram nobis, there is no indication that the legislature intended to eliminate a remedy which existed prior to the enactment of the statute.[6]

Given the state of the law at the time 14 M.R.S.A. § 5502 was adopted and the language of the statute itself, there is nothing I can find which suggests that the legislature intended to require "existing actual or physical restraint or a technical hold" as a prerequisite to the relief made available under section 5502.

For these reasons, I respectfully dissent.

WERNICK, Justice, dissenting.

I join in the dissent of Mr. Justice Pomeroy, adding a comment to explain why I see fit to dissent when it seems that for the third time in the last nine years this Court takes a position contrary to the view I espouse.

Were such appearance actually true, I would not dissent merely because it happens that I was not on this Court when *Thoresen* was decided in 1968 or when *Staples* was argued (and, therefore, did not participate in the decision of *Staples* even though by then I had become a member of the Court). Were these the only factors

4. Petitioner claims the conviction in Maine resulted in an enhancement of the sentence received in another state upon conviction of a crime in that state.

5. *An* examination of P.L. 1961, c. 131, reveals that the statute merely codified the common law writ of error coram nobis. *See Mottram v. State*, 160 Me. 145, 200 A.2d 210 (1964); *Dun-*

*can v. Robbins*, 159 Me. 339, 193 A.2d 362 (1963).

6. Relief in the nature of error coram nobis is recognized and exists in the federal courts. *Gajewski v. United States*, 368 F.2d 533 (8th Cir. 1966); *United States v. National Dairy Products Corp.*, 313 F.Supp. 534 (W.D.Mo. 1970).

involved, my attitude would be that for the Court to adhere to the same view three times in the nine years immediately past must surely be enough, and one who disagrees should be willing to submit on grounds of stare decisis. I would feel strongly about this, having written for this Court to ". . . remain a government of laws and not of men . . ." ours must always act as a ". . . government in which the decisions of courts . . ." will not be merely ". . . the personal policy choices of that handful of persons who happen, at any given moment, to possess judicial power." *State v. Sklar*, Me., 317 A.2d 160, 171, 172 (1974).

It eventuates here however, that, despite appearance, the reality is that a majority of the members of this Court have decided contrary to the position Mr. Justice Pomeroy and I now assert in dissent only once:— in *Thoresen*, and indeed, there, only a bare majority of the Court had participated. In *Staples* only three of this Court's then six-member constituency sat, and today any significance attaching to *Staples* is further diminished by Mr. Justice Pomeroy's statement that he now believes that *Staples* was wrongly decided, and he should not have joined in the opinion. Even in the present case, the opinion of Mr. Justice Delahanty will speak only for a minority of this Court's present constituency of seven.

In such circumstances, being firmly convinced that *Thoresen* was wrongly decided, I deem it my obligation to join in dissent with Mr. Justice Pomeroy, thereby to ensure that a majority of the membership of this Court will not yet have upheld *Thoresen* on reconsideration. The issue involved will be crystallized as remaining open to await definitive resolution in the future either by action of the Legislature or a subsequent decision by a majority of the members of this Court.